## Case No. 11,115.

PIATT v. OLIVER et al.

[2 McLean, 267.] [1]

Circuit Court, D. Ohio. Dec. Term, 1840. [2]

PUBLIC LANDS — ASSOCIATION TO PURCHASE AT SALE — EXECUTION SALE — EQUITY OF REDEMPTION — PLEADING IN EQUITY — PARTIES — TRUSTS.

1. Where a complainant files a bill, claiming for himself and others certain tracts of land purchased in partnership, to sustain the suit it is enough to show that the land was purchased by the partnership funds, without specifying the amount contributed by each partner.

2. A contract made in fraud of the law, which grows out of, or is connected with, an immoral act, will not be enforced.

[Cited in Tufts v. Tufts. Case No. 14,233.]

[Cited in Richardson v. Buhl, 77 Mich. 661, 43 N. W. 1111; Daniels v. Stevens, 19 Ohio, 244.]

3. An agreement not to bid against each other at a sale on execution is against public policy, and consequently invalid.

4. But on a sale of public lands, it is not unlawful for individuals to associate together to purchase for their joint interest.

[Cited in M'Elroy v. Swope, 47 Fed. 386.]

5. Such an association is unobjectionable, where there was no fraud, and especially where a high price was given for the land purchased.

6. A doubt may well be entertained whether a rule which, in this respect, applies to sales of chattels on execution, can apply to a public sale of lands by the United States. Great numbers attend these sales, general notice of them being required. And such restrictions are imposed as are deemed necessary to protect the public interest. They are made, too, on a national scale.

7. The reason of the rule, which forbids associations for the purpose of purchasing, &c., does not apply.

8. In this case there was no agreement not to bid against each other, but that certain tracts should be bought at the sale by the joint company.

9. That one of the parties, who had acted as agent, should shelter himself from responsibility under such circumstances, instead of promoting, would defeat the great ends of justice.

10. The transaction was sanctioned by the government in issuing certificates of purchase, and afterwards by the relief given under a special law.

11. No judgment of a state or territory can affect lands beyond the jurisdiction of such state or territory.

12. The jurisdiction of the territory of Michigan extended south to the northern boundary of Ohio as first run, and until such boundary was altered with the assent of congress.

13. This alteration of the line with the assent of congress, which extended the jurisdiction of Ohio north, cannot affect titles to real estate acquired by judicial proceedings in Michigan, with-

in the territory over which the jurisdiction was thus changed.

14. An agency, as against the individual, may be proved by his acts and declarations. The intent with which certain acts are done may be inferred from the facts connected with the circumstances.

[Cited in brief in Bradstreet v. Everson, 72 Pa. St. 124.]

15. When a judgment is used as evidence, its regularity cannot be inquired into.

[Cited in U. S. v. Walsh. 22 Fed. 648.]

[Cited in Holland v. Jones, 9 Ind. 496.]

16. At common law an equity of redemption is not liable to be sold on execution, nor by attachment.

[Cited in Hill v. Smith, Case No. 6,499.]

17. It is made liable in some states by statute. In the territory of Michigan. an equity, vested in an agent for certain purposes by the cestui que trusts, the fee being in the government, cannot be levied on and sold by an attachment against the agent.

18. A purchaser at the sale on the attachment. under such circumstances, can acquire no right. And an assignment by the trustee to the purchaser, being for no other consideration than the sale by attachment, can convey no interest. The proceedings on the attachment being invalid, the assignment, as a consequence of those proceedings, must be equally invalid.

19. This matter is properly examinable in equity. And although on the assignment of the certificate of purchase, patents may have been obtained by the assignee, his right may still be inquired into.

20. The assignee of an equity takes it generally subject to all equities. This is especially the case, where the assignee had a full knowledge of the interest assigned.

21. All persons materially interested in the subject matter of the suit must, if within the jurisdiction of the court, be made parties.

22. There are some cases where a trustee may sue, without naming the cestui que trusts, but the cestui que trusts must be named, where the object is to divest them of title.

23. In general, the cestui que trusts must be made parties.

24. If the demand existed on the trust fund before the trust was created, a suit may be sustained against the trustee only.

25. Where the parties are so numerous as not to be inserted conveniently in the record, suit may be maintained in the names of a part for the whole.

26. In a proceeding in equity, to foreclose a mortgage given by the trustee, the cestui que trusts are necessary parties. And a sale of the premises. where the cestui que trusts are not made parties, does not bind their interests.

27. The assignment of the certificates of purchase for the land sold under the mortgage by the trustee, by which the purchaser, as assignee, obtained patents. being made under the mortgage sale, cannot bind those who were not parties to the suit.

[Cited in Sheldon v. Sheldon, 3 Wis. 708.]

28. After the execution of the mortgage, the trustee had no power to sell.

29. It is a well established principle in equity, that the act of a trustee shall not prejudice his cestui que trust. If a trustee purchase the estate of his principal. the sale, as a matter of course, is set aside unless ratified.

30. If a trustee purchase land with the trust fund, and take the conveyance in his own name, in equity the land is held as a resulting trust.

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

[2] [Affirmed in 3 How. (44 U. S.) 333.]

31. Whatever acts are done by the trustee. are presumed to be done for the benefit of the cestui que trusts, and not for the benefit of the trustee.

32. Wherever the trust fund is converted into another species of property, if its identity can be traced, it is liable in its new form to the cestui que trust. In such a case the cestui que trust may exercise his option either to take the property or pursue some other remedy. This doctrine applies to all persons who act in a fiduciary character.

33. An individual who has an interest in certain real estate, for the management and sale of which a trustee is appointed, must be presumed to know the nature of his title and the acts of the trustee. He cannot, having purchased the estate from the trustee, set himself up as an innocent purchaser without notice.

34. The statute of limitations does not run against an established trust.

[See Miles v. Thorne, 38 Cal. 335.]

35. Nor will lapse of time, except under extraordinary circumstances, operate in a case of trust.

In equity.

OPINION OF THE COURT. At December term, 1837 [Case No. 11,114], this case was before the court on pleas in bar, filed by the defendants, Oliver and Williams. These pleas were overruled, and answers being filed, the case now stands on its merits. In the summer of 1817, the complainant, in connexion with John H. Piatt, William M. Worthington, and Gorham A. Worth, formed an association to purchase lands of the United States, at a public sale, which was shortly to take place at Wooster, in this state—and the complainant was appointed the agent of the company, to attend the sale for that purpose. Another association, consisting of Martin Baum, Jesse Hunt, Jacob Burnet, William C. Schenck, William Barr, William Oliver and Andrew Mack, was formed for the same object—and William Oliver and William C. Schenck were appointed its agents to attend the sale. Before the sale took place, it was discovered that both companies were desirous of purchasing the same tracts of land, and the agents agreed that they would purchase tracts one, two, three and four, at, and including the mouth of Swan creek, in the United States reserve, at the foot of the rapids of the Miami; and, also, numbers eighty six and eighty seven, on the other side of the river, opposite the mouth of Swan creek, for the joint benefit of both companies; each company to have one-half of the lands purchased, and to pay at the same rate. Numbers eighty six and eighty seven were bid off by Oliver, and the certificates of purchase issued to him. The other tracts were bid off by the complainant, and the certificates of purchase were issued in the names of the association represented by him. At the same sale, the complainant, in behalf of his company, purchased the northwest quarter of section two, township three, the southwest quarter of the same

section, the northwest quarter of section three, township three, and, also, the southeast and southwest quarters of the same section, in said reserve; and one fourth of the purchase money on each tract being paid, certificates of purchase were made out in the names of the company. And the other agents purchased for their company, at the same sale, other tracts of land. On the return of the agents to Cincinnati, their acts were ratified by both companies. One company was designated the Piatt Company, the other the Baum Company; and the union of both, in regard to the lands jointly purchased, was called the Port Lawrence Company. The joint, or Port Lawrence Company, having made their purchase with the view of laying out a town, to be called Port Lawrence, appointed Baum a trustee, and authorized him to sell lots, and do other things in relation to his agency, for the benefit of the company. On the 14th of August, 1817, Baum appointed Oliver his attorney, to sell lots in the town to be laid out, receive the money, and give certificates of sale, in the nature of title bonds, to the purchasers; and he, in association with William C. Schenck, was authorized to lay out the town. Baum, and, also, the proprietors, gave to Oliver a letter of instructions in relation to the plan of the town, the sale of the lots, &c. By the conditions of sale, one fourth of the purchase money was to be paid down, and the residue in three equal annual payments. At the sale of lots, the sum of eight hundred and fifty five dollars and thirty three cents was received by Schenck, for which he was to be accountable to Baum. At the sale, Oliver purchased lots 223 and 224, an undivided half of which he afterwards conveyed to Baum, and they erected a warehouse and other improvements on them. In August, 1818, he sold one half of his interest in the Port Lawrence Company to William Steele and William Lytle; and in March, 1819, he sold the residue of his interest to Micajah T. Williams, one of the defendants, and his partner Embre. By the reduction of the price of the public lands, and the pressure of the times, the Port Lawrence Company were under the necessity of relinquishing to the United States tracts one and two, having agreed to pay for the same about twenty thousand dollars; and of appropriating the money paid on them to the payment in full of the residue of the tracts purchased by them, and by the Baum and Piatt Companies respectively. In pursuance of this object, the five quarter sections purchased by the Piatt Company were assigned to Baum, the 17th September, 1821; and, on the same day, tracts numbered one, two, eighty six and eighty seven, purchased in the name of the Piatt Company for the Port Lawrence Company; and, also, tracts three and four, purchased by Oliver for the same company, were assigned to Baum. It is al-

ledged that these tracts had been previously assigned to Baum, of which there is no evidence.

On the 27th September, 1821, Baum, through his agent, Micajah T. Williams, one of the defendants, relinquished, to the United States, tracts one and two. On these tracts there had been paid the sum of four thousand eight hundred seventeen dollars and fifty five cents. Thirteen hundred seventy two dollars and thirty four cents of this sum were applied to complete the payments on tracts three, four, eighty six and eighty seven, the residue of the tracts purchased at the sale by the Port Lawrence Company. From the relinquished tracts, there still remained three thousand four hundred forty five dollars and twenty one cents. Of this sum, one half belonged to the Piatt Company. Twelve hundred and forty eight dollars were applied to complete the payment on the five quarter sections, which left a balance of four hundred seventy four dollars and sixty cents still due to the Piatt Company; but which was applied in payment of lands held by the Baum Company. After the relinquishment of the tracts on which the town had been laid out, the purchasers of town lots claimed a return of the money paid by them, with interest, and, also, damages for their improvements. On the 10th September, 1822, Baum gave to Oliver a certificate which stated there was due him, by the Port Lawrence Company, the sum of two hundred thirteen dollars and two cents, which he refunded to purchasers of lots, by the request of the company, "it being the amount due on the shares originally owned by John H. Piatt, Robert Piatt, G. A. Worth and William M. Worthington." And on the 27th August, 1823, Oliver having made out an account against the Port Lawrence Company, for money paid by him to purchasers of lots, and services rendered as agent, Baum admitted his account, amounting to the sum of eighteen hundred thirty five dollars and forty seven cents; to secure the payment of which, Baum executed to him a mortgage on tracts three, four, eighty six and eighty seven. The payment was to be made, with interest, on or before the first of January, 1824. The 7th October, 1825, Oliver caused an attachment to be issued by the clerk of Monroe county, in the Michigan Territory, against Baum and the members of the Piatt Company, on the certificate of indebtment given by Baum. This attachment was levied on four of the five quarter sections owned by the Piatt Company, and such proceedings were had on the attachment, as to obtain an order of sale of the property attached; three of the quarters were sold, by the auditors appointed, for the sum of two hundred forty one dollars and sixty cents, to Noble, the agent of Oliver. Noble, shortly afterwards, conveyed these tracts to his principal. A bill to foreclose the mortgage given to Oliver, was filed by him in the supreme court of Michigan, the 13th of October, 1825. And a final decree having been obtained, the mortgaged premises were sold, by the assistant register of the chancery court, to Oliver, the 1st September, 1828, for six hundred eighteen dollars and fifty six cents.

By the act of 20th May, 1826 [4 Stat. 180], the secretary of the treasury was authorized to select, for the benefit of the University of the Michigan Territory, a certain number of acres of the public lands within the territory, and he selected tracts one and two, which had been relinquished. In the summer of 1828, as appears from the report of the committee of the trustees of the university, Oliver, as the agent of Baum and others, proposed to exchange certain lands owned by Baum, in the vicinity of Port Lawrence, or any of the public lands subject to entry, for tracts one and two, on which the town of Port Lawrence had been laid out. A law of congress was passed, authorizing the exchange, the 13th January, 1830 [Id. 370]. Previous to this, Baum assigned to Oliver the final certificates for the tracts he purchased under the attachment, and, also, under the decree of foreclosure; and one of the quarter sections levied on by the attachment, but not sold under it, in payment of the balance of the judgment on the attachment, which enabled Oliver to obtain patents for the same in his own name. And on his conveying to the university tracts numbered three and four, except ten acres reserved of number three, and the northwest quarter of section two, town. three, and, also, the northwest and southwest quarters of section three, town. three, he received an assignment from the university of their right to tracts one and two, for which patents were issued in the name of Oliver. After the exchange was effected, Baum, and the defendant Williams, each purchased an interest of one third in tracts one and two, eighty six and eighty seven. After Baum's death, in 1832, Oliver purchased his interest from his heirs. And the 1st December, 1832, Oliver conveyed to Williams an undivided half of the ten acres reserved in number three. On the 23d May, 1834, he conveyed to him an undivided half of tracts eighty six and eighty seven, except sixty acres which had been sold to Prentice and Fromley; and on the —— day of November, he conveyed to him "one undivided half of lots one and two, on which Port Lawrence was laid out, together 'with a like interest in all sales and improvements thereunto belonging.'" Oliver, Baum and Williams, agreed to lay out the town of Toledo on the site of Port Lawrence, and to make titles to the Port Lawrence purchasers of lots, on their complying with their contracts. Some years after this, Oliver purchased from the Michigan University the tracts of land he conveyed to it in exchange for tracts one and two. Of the Piatt Company, John H. Piatt is deceased, and his administrators and heirs are made parties to this suit. William M. Worthington assigned one half his interest in the Port

Lawrence Company, and it is claimed and represented by John E. Worthington. The interest of Worth has been assigned to the defendant Ewing, who also claims the entire interest of Baum, Mack, Barr, Burnet, and half the interest of the complainant. Of the Baum Company, Martin Baum, Jesse Hunt, William C. Schenck and William Barr, are deceased.

These are the outlines of the present case. Many of the facts have been omitted in this statement, which will be adverted to in considering the legal questions that are involved. On the part of the defendants' counsel, it is objected that the complainant has failed to show, either in his bill or by the proof, any interest in the subject matter of controversy, which will enable him to maintain this suit. And as this objection goes to the very ground of the right asserted, it will be first considered. In his bill, the complainant states, that he, in connection with the other members of the Piatt Company, formed an association to purchase public lands. And this allegation is proved by an instrument of writing signed by the parties. And it appears from the bill and the evidence, that the company paid a large sum on the purchases made by them separately, and as connected with the Port Lawrence Company. It does not appear how this money was obtained, whether by an equal contribution of the partners or otherwise; nor is it necessary for the purposes of this suit, that this should appear. It is enough to show that the complainant, and the others named, were partners, and that the money paid was the money of the company; that the lands purchased were for the interest of the company; and all this is sufficiently shown by the pleading and evidence.

The next point which it seems proper, in the order of time, to examine, is, as to the legality of the joint purchase by the two companies at the public sale. On the part of the defendants, it is contended there was an unlawful combination, between these associations, to purchase the public lands at the sale at a reduced price. That, in effect, they agreed not to bid against each other, and by that means, bought the tracts stated at a less price than they would have sold for. And that, under such circumstances, neither a court of law nor a court of chancery will give any relief. That the contract was made in fraud of the law and against public policy, and, consequently, can receive no countenance in a court of justice. This question was raised by the pleas in bar above noticed, but as the pleas were held to be defective on other grounds, it was not then decided. The first and leading authority on this subject, is in the case of Bexwell v. Christie, 1 Cowp. 395. The plaintiff sent a horse to an auctioneer to be sold with other goods, which belonged to a deceased person, the whole of which were to be sold to the best bidder; but the auctioneer was directed not to sell the horse under £15—he

was bid off for £6 16 6. And the question was, whether the owner may employ another person to bid for him privately. The court considered this unfair, and that it was a fraud upon the public to throw this horse into the sale of goods represented as being an executor's. The plaintiff was nonsuited. Upon the authority of this case, was, afterwards, decided Howard v. Castle, 6 Term R. 642. In that case, it was held that where puffers were secretly employed by the seller, the sale was fraudulent, and the bidder to whom the property was struck off, was not obliged to complete the contract. In the case of Jones v. Caswell, 3 Johns. Cas. 29, it was decided that no recovery could be had upon the note in question, as it had been given to induce the plaintiff not to bid at a sheriff's sale. That it was against public policy. A contract made in fraud of a law will not be enforced, or where it grows immediately out of, or is connected with, an illegal or immoral act. Hannay v. Eve, 3 Cranch [7 U. S.] 242; Armstrong v. Toler, 11 Wheat. [24 U. S.] 258.

In 1 Story, Eq. Jur. 290, it is laid down that agreements, whereby parties agree not to bid against each other at a public auction, especially on a sale of chattels, or other property on execution, are held void, as against public policy. And so, if underbidders or puffers are employed at an auction to enhance the price and deceive other bidders, and they are in fact misled, the sale will be void. Doolin v. Ward, 6 Johns. 194; Wilbur v. How, 8 Johns. 346; Bartle v. Administrators of Coleman, 4 Pet. [29 U. S.] 184; Craig v. State of Missouri, Id. 436. An unlimited number of authorities might be cited to show, that a contract made in violation of the law, or against its settled policy, will not be enforced. In [Case No. 11,114] a number of authorities are cited to sustain that position. And also a number which, to some extent, conflict with some of the principles laid down in Cowper and in other authorities. In the case of Conolly v. Parsons, 3 Ves. 624, it is said to be the common practice for bidders not to bid against each other for particular lots. And as a protection against this, it is said the seller may employ persons to bid for him. Bramly v. Alt, Id. 623. The purchaser objected to a specific performance on the ground that the vendor employed a person to bid against him, and the fact was admitted. The property was put up at £900. The defendant bid £10, and the person employed by the plaintiff bid £920, the defendant then bid £950, and it was knocked down to him. Under these circumstances, Lord Loughborough decreed a specific performance. It would seem not to be reasonable or just in every case, without regard to circumstances, where a seller of property has employed a bidder to protect his interest, to hold the sale void. But however this may be, there can be no doubt that an association of in-

dividuals may be formed for the purpose of purchasing property, either at public or private sale. This is nothing more than a limited partnership for a special object, and it is strictly legal. Such associations, it is known, have been formed to purchase the public lands at public auction and otherwise; and no objection is believed to have been made to them by the government. At the time the sale in question was made, the law fixed the minimum price at two dollars per acre, for which the land must sell; and this guarded the public interest. After the sale, any of the lands which had been offered and not sold, were liable to be entered at that price. And the whole policy of the government has regarded a fair and open competition as more important, than to obtain a high price for the land. This is shown by the reductions of the price of the public lands, the liberal manner in which pre-emption rights have been given, and the indulgences granted to purchasers under the credit system.

In the present case, there was no agreement that one company should not bid against the other, but that certain tracts being desired by both companies, should be purchased for the joint interest of both. Was there any thing immoral in this? Was it in fraud of the law, or against the public policy? We can best judge of an action by its effect. And what was the effect of this combination which is so much complained of? The two tracts of land in controversy, numbered one and two, containing about four hundred acres, sold for about twenty thousand dollars; and the other tracts purchased by the joint company, sold higher than other tracts purchased by individuals. If this transaction then be scrutinized, it will be found to have operated most beneficially to the government, and injuriously only to the purchasers. They agreed to pay a much greater sum than the land was worth. A sum so extravagant, that, to save the company from ruin under the pressure of the times, they were obliged to relinquish it to the government. And it is said that the company had determined to forfeit the payment on these tracts of more than four thousand dollars which they had made, rather than pay the balance of the purchase money, before the relief law of 1821 [3 Stat. 612] was passed. And yet the counsel for the defendants contend that, by reason of this combination, tracts one and two were sold for less than they would under other circumstances have sold for. Whatever other objection may be urged to this association, there would seem to be no ground for this objection.

In another branch of the argument, the character of Baum is relied on against the imputations made in the bill; and with how much greater force may the same argument be used against the imputations of the answers, by referring to the Port Lawrence Company, which included Baum, the defend-

ant, Oliver, and other gentlemen of high character. This transaction, in our view, is sustainable on principle and authority. And if in this view doubts could arise, still it would not follow that the defence could be available to the defendants. We consider the purchase fair to the public, to bidders, and free from objection under the law. It was sanctioned by the government, and that without objection. But if objection could be made to the purchase, it could avail the defendants nothing. The sale was not only sanctioned by the government, but, under the relief law of 1821, the transaction was again sanctioned, and assumes a new aspect by the application of the money paid on tracts one and two, to complete the payments on other purchases. Where persons have combined to defraud the public, and one individual happens to get the advantage of another, no court will grant relief. The agreement being infected with fraud, and each party being alike guilty, no court will apportion between them the wages of their iniquity. But the Port Lawrence Company, in their association and purchase, were guilty of no immorality. They violated no public policy or law; they did nothing injurious to the public interests—nothing which had not been ordinarily done, in similar cases, under the sanction of the government. A rule which would enable a participator in such a transaction, who had obtained a title for the land purchased, to shelter himself from responsibility under the plea of fraud, would itself become an instrument of the grossest injustice. It is due to the justice of the case, to the character of the persons concerned, not excepting the defendant, Oliver, to vindicate the transaction from any just imputation of fraud. And this defence of fraud at the public sale, as it regards the interests of the other principal defendant, Williams, is equally unsustainable. He was not a party to the purchase at the sale, but subsequently having acquired an interest in the lands purchased, it is insisted that his right is not examinable on account of the original fraud. In other words, that a vendee instead of relying upon his contract of purchase, may hold the property by showing that the vendor had obtained it fraudulently, or against public policy; and this without having the shadow of a right, except that which is derived under the vendor. When such a rule shall be sanctioned by that court, whose decision is the law of this court, it will here be recognized.

Where a person's property is taken by execution and sold against his consent, it is just and proper that his interests should be scrupulously guarded. The property to be sold is generally of small amount, and but few persons attend the sale under the limited notice required to be given. Any combination which shall defeat a fair competition, under such circumstances, would be unlawful; and any contract, on which such combination was formed,.

would be void. But suppose at such a sale, some two or three individuals being desirous of purchasing the property, associate together for that purpose, and buy the property at its full value, there being an open sale and competition, could the purchase be set aside? And if, in addition to this, the owner of the property subsequently to the sale receives it back again, and gives to the purchasers, other property or money in lieu of it, would the transaction be fraudulent? And could one of the party purchasers, having got possession of the property or money received in exchange, and claiming it as his own, protect himself against his partners, on the ground that the original purchase was fraudulent?. The public sales of lands are made on a liberal and national scale. Notice of a sale is given throughout the United States, and the large amount of the public domain to be sold on such an occasion, not un-. frequently attracts particular attention in every part of the Union. Vast numbers of persons attend the sale, and hundreds, if not thousands. become bidders. Such regulations as are deemed necessary to protect the public interests are adopted by congress, and, under their authority, by the executive branch of the government. It may well be doubted whether a rule which may be salutary and just in a sale on execution, must be equally applicable to a sale of the public lands by the government. For the present purpose it is enough to say, that we see nothing in the original purchase of the lands in question which can effect its validity.

We will now examine the jurisdiction of the courts of the Michigan Territory, before whom the proceedings in attachment, and the decree of sale of the mortgaged premises, were had. No judgment or decree of the courts of any state or territory can operate upon the title to lands in another state or territory. It is peculiarly the province of the sovereign power to regulate, whether by operation of law or by actual conveyances, the transfer of real estate within its own jurisdiction. And no conveyance or will, executed in a foreign state, can have any effect, except under the laws of the state where the land is situated. That the lands in controversy in this suit are now within the acknowledged jurisdiction of Ohio, is admitted; but it is contended they were within the jurisdiction of Michigan at the time the proceedings stated took place. By the law of congress [2 Stat. 173] authorizing the people of Ohio to form a state government, it is declared, that the state to be formed shall be bounded "on the north by an east and west line drawn to the southerly extreme of Lake Michigan. running east, after intersecting the due north line aforesaid, from the mouth of the Great Miami, until it shall intersect Lake Erie, or the territorial line, and thence with the same through Lake Erie," &c. This boundary was adopted by the convention, and was copied into the constitution of Ohio, with a proviso "that if the southerly bend or extreme of Lake Michigan should extend so far

south that a line drawn due east from it should not intersect Lake Erie, or if it should intersect the said lake east of the mouth of the Miami river of the lake, then and in that case, with the assent of the congress of the United States, the northern boundary of the state shall be established by, and extended to, a direct line running from the southern extremity of Lake Michigan to the most northerly cape of the Miami Bay, after intersecting the due north line from the mouth of the Great Miami river as aforesaid; thence northeast to the territorial line, and by the said territorial line to the Pennsylvania line;" and the constitution was sanctioned by congress with this proviso.

Under a law of 1812 [2 Stat. 741] ti. surveyor general of the United States caused two lines to be run, one in conformity with the act of congress, copied into the constitution of Ohio, and the other as called for by the proviso in the constitution. And, in pursuance of a law of 1831 [4 Stat. 479], the president of the United States caused to be ascertained, by observation, the latitude and longitude of the most northerly cape of the Miami Bay, and also the point at which a direct line drawn east from the southerly extreme of Lake Michigan will intersect the Miami river and bay. And it was found that the latter line was forty one degrees thirty seven minutes and seven seconds north, and the former forty one degrees forty four minutes and seven seconds north. These observations are supposed to correspond with the lines run by the surveyor general. Neither the lines nor the observations seem to have been satisfactory to the parties concerned, but they are sufficiently accurate for the question of jurisdiction in this case. From the proviso in the constitution it appears, that the northern boundary was to run to the most northerly cape of the Miami Bay, and if the line running east should be south of that, with the assent of congress, it was to be so altered as to run to the cape. But the consent of congress being a condition precedent to any deviation from an east line, such line being run, constituted the northern boundary of Ohio until changed under the sanction of congress. The required assent of congress was given by the act of the 23d June, 1836 [5 Stat. 56]. which declared "that the northern boundary of the state of Ohio shall be established by, and extend to, a direct line running from the southern extremity of Lake Michigan to the most northerly cape of the Miami Bay." As the northern boundary of Ohio, whether temporarily or permanently established, constituted, in that part, the southern boundary of Michigan, it follows that the jurisdiction of Michigan was properly exercised north of the line, and that of Ohio south of it. And it would seem that the alteration of the line, with the assent of congress, which extended the jurisdiction of Ohio further north, should not affect titles acquired in any legal form under the jurisdiction of Michigan. This is a very different question from one which arises under a disputed location of boundary. In such a case,

the settlement of the boundary shows whether the jurisdiction exercised by the litigant parties has been rightfully or wrongfully exercised. But in the present case it is clear, that the jurisdiction of Ohio could not be legally exercised north of the east line, until the assent of congress to a line that should strike the cape was obtained. No question can arise as to the power of congress to act in the case, as Ohio, in her own constitution, made their consent a condition precedent and indispensable. It is admitted that the land in controversy lies north of the east line, and south of the line running to the cape. And this would seem to determine the right of jurisdiction to be in Michigan, until the act of 1836.

We will now examine the nature and extent of the agency of Baum, and also of that of Oliver. There is no evidence in writing which shows the nature of the trust vested in Baum. It appears from the bill and answers, that tracts one and two were purchased by the Port Lawrence Company, with a view of laying out and building up a town; and that Baum was appointed a trustee to sell lots in the town, make titles, and superintend the concerns of the company. In his deposition Judge Burnet says his impression is, "that Baum's powers were general and unrestricted. That the company relied on his judgment and correctness in everything relating to their interest, and expected he would lay out a town and dispose of the lots as he thought best. He says the company did not meet often, nor did they frequently give instructions to Baum. They seem to rely on his prudence and discretion." In their instructions to Oliver, to lay out the town, &c., the proprietors of the Port Lawrence Company say "an immediate correspondence is to be opened by the agent with Martin Baum, Esq., of this city, (Cincinnati,) who will act as trustee for the proprietors; and every information will be given to him, in relation to the business of the agency, the progress of the settlement, and the sale of lots, that may be required or deemed essential to the interests of the concern."

The complainant states, in the amended bill, that Baum was appointed trustee, and accepted the trust; and that it was agreed "that the certificates for said tracts should be assigned to him to enable him to execute the trust." He, it seems, had power to appoint an agent, and he did appoint Oliver. Baum acted in this agency, it is insisted, until his death. There is no pretence that it was terminated prior to the assignment by him of the lands of the company. He also acted as agent for the Baum Company, in relation to other lands held in their own right. Oliver's agency was constituted under the hand and seal of Baum. The instrument is dated the 14th August, 1817, and authorized Oliver, "in the name of Baum, to sell and dispose of the lots in a town to be laid out at Swan creek, on the Miami of the lake, agreeably to a letter of instructions therewith delivered, and to receive payment for the same from the purchasers; and to execute and deliver certificates, in the nature of title bonds, for the lots by him sold; and to do all lawful acts requisite for effecting the premises." As it regards the plan of the town, the conditions on which lots were to be sold, &c., Oliver received from the proprietors a letter of instructions, bearing the same date as the power of attorney from Baum, and also a letter of instructions from him of the same date, and which is an exact copy of that of the proprietors. On the same day Baum addressed a letter to Oliver, in which, after referring to his agency, he says, "Your appointment is for one year, commencing this day, for which services so rendered you are entitled to receive from the proprietors twelve hundred dollars." And he further remarks: "And the proprietors of the lands lying in that county, but which is a distinct concern from the above, have agreed to allow you three hundred dollars for attending to their separate business." And there is among the papers a regular power of attorney, from Baum to Oliver, in regard to this separate interest, of the same date as the above. In the spring of 1818, Oliver was appointed cashier of the Miami Exporting Company Bank; and on the first of July ensuing he assumed the duties of that appointment. At this time, he alledges in his answer, he surrendered his agency to Baum, and made with him a final settlement. He admits, however, that being interested with Baum in town lots 223 and 224, on which they built a warehouse and other improvements, and having other lands in the neighborhood, and possessing a better knowledge of the business and interests of the Port Lawrence Company than any one of the parties concerned, he was repeatedly brought in contact with Baum, was consulted by him, and on his occasional visits to the Maumee country, was intrusted with business for the company after the close of his agency.

On the part of the complainant, it is contended that his agency continued, and did not terminate on his assuming the duties of cashier; and in proof of this his acts are relied on. The power of attorney to Oliver was unlimited as to time, and there is nothing which restricts it to one year, unless it be the letter which fixes his compensation; and the limitation of this letter may be considered perhaps as much, if not more, with reference to the salary allowed, than to the authority given him. The duties, however, of cashier, were wholly incompatible with that general superintending agency which it would seem, from the salary paid, was at first contemplated. He resided a considerable part of the first year of his agency at Port Lawrence, and gave the greater part of his time to the concerns of the company. He alledges, in his answer, that Peter G. Oliver, in 1818, and for three years thereafter, acted as agent for the company; and being young and inexperienced, the defendant frequently advised him respecting the business. And John E. Hunt, the defendant also alledges, acted as

agent for the company. But it seems from the accounts stated by Baum against the Port Lawrence Company, and also by accounts presented by Oliver to Baum for services rendered and moneys paid, that he acted as his agent, at least to some extent, down to the spring of the year 1830. It is true that several of these accounts related chiefly, and some of them exclusively, to the concern of the Baum Company, which was entirely distinct from the Port Lawrence Company. The last account rendered contains a charge for surveying two small tracts which related to the Port Lawrence Company. In fact, his claims against the Port Lawrence Company, on which was instituted his legal proceedings, and on which his whole title rests, except the amount paid by him and his partner, Baum, for lots 223 and 224, and their improvements, were founded on moneys refunded by him to purchasers of town lots and services rendered. This could only have been done in the capacity of agent. It cannot be supposed that as a mere volunteer, without authority, he would make these advances; indeed, this is not pretended by the defendant. He alledges that, having been agent in selling the lots, and instrumental in inducing many to purchase, he felt bound to aid in indemnifying them after the town tracts were relinquished to the government. The agency which Oliver exercised, after his duties as cashier commenced, was of a more limited character than that with which he was at first invested. He was not bound, perhaps, to give any fixed portion of his time to the business of the company; but that he did transact, after the 1st July, 1818, the principal business of the Port Lawrence Company, is shown by his acts and declarations. On the 19th September, 1818, associated with Wm. M. Worthington, he divided between the proprietors the unsold lots. And in a letter to Sage, dated at Piqua, March 27, 1825, he says: "The company (meaning the Port Lawrence Company) were and are largely indebted to me; and at the request of Mr. Baum, trustee, I continued, after disposing of my interest in the company, to aid in the perplexing business of the concern, as I understood the details better than himself." And in reference to Mr. Prentice, a purchaser of the Port Lawrence Company, he says: "I procured him a deed, and other things, for his advantage. Mr. Prentice knows I would not have acted without authority," &c. In 1823, Prentice swears, "being at Cincinnati, to settle for work done at Port Lawrence, where he saw Oliver and Baum, and was told by both of them that Oliver was still the agent of the proprietors of Port Lawrence."

Having examined the authority under which Baum and Oliver acted, we will now consider their acts, separately and conjointly, as they are supposed to be connected with the merits of this case. The assignment of tracts three and four was made by Oliver to Baum, the 15th September, 1821; and about the same time the Piatt Company assigned to him tracts one, two, eighty six and eighty seven, and also the five quarter sections; and at the same time Baum appointed the defendant, Micajah T. Williams, agent, to relinquish to the government tracts one and two, and to apply the money which had been paid on them to the full payment of other tracts. The assignment of the tracts owned by the Port Lawrence Company may have been made in pursuance of the trust vested in Baum; but the complainant asserts that the five quarter sections were assigned to him, to enable him to apply to their full payment a part of the money arising from the relinquished tracts. There is no evidence which contradicts this averment, and the circumstances of the case go strongly to establish it. The act of the 2d March, 1821, under which the relinquishment was made, requires "the legal holder of any certificate, or certificates, to file a relinquishment with the register of the land office, and to apply the money which had been paid on the relinquished tract to the payment of others." An assignment of the five quarter sections to Baum enabled his agent to complete the payments on them by the above appropriation. The bill alledges, that tracts one and two were relinquished by the Port Lawrence Company, with the intention of repurchasing them. This is denied by the answers; and Judge Burnet, in his deposition, states that he was a member of the Port Lawrence Company, and was unapprized of any such intention.

On the 20th January, 1822, four months after the relinquishment. Baum prepared a petition to congress, stating the purchase of the two tracts relinquished, the purchase money for which amounted to about twenty thousand dollars; that in August, 1817, a town was laid out on them by him, and that many of the lots were sold, and bonds for a title given to the purchasers; that the reduction of the price of the public lands by congress, and the pressure of the times, disabled him from paying the purchase money to the government, and he was obliged to surrender the tracts to the United States; that being unable to make titles, he was liable to suits for damages by the purchasers of lots; and he prays that the tracts might be again offered for sale, or that relief in some other form might be given him. This petition was forwarded to Mr. Ross, a member of congress from Ohio, who presented it to the house of representatives. On the 25th December, 1822, Baum forwarded a duplicate of the above petition to congress, in a letter to Mr. Brown, a senator from Ohio, in which he says: "Inclosed is the petition, signed by myself only; still, others have an interest in it;" naming Williams, Piatt, and others; and he speaks of the just claim which he and his associates had for redress. In another letter to Mr. Brown, on the same subject, of the 6th February, 1823, he says, "The

tracts purchased by himself and his associates can be ascertained at the land office." The 20th January, 1823, Baum agreed with Prentice, who purchased lot 192, that if Baum and his associates should repurchase lots one and two, so as to be able to make a title to lot 192, they might do so, and Prentice agreed to relinquish the 30 acres, in lot 86, which he had received in lieu of it; and a similar arrangement was made with Jacob Bromley for lot 71, in Port Lawrence.

In a letter to Mr. Graham, the commissioner of the general land office, dated 20th July, 1827, Baum says: "In consequence of the president's proclamation, announcing the sales of lands, he attended at Delaware, on the 9th instant, but was much disappointed to find that, by the instructions of the general land office, lands north of the Ohio boundary were not offered for sale;" and, he says, that he went there for the express purpose of purchasing tracts one and two, in the Maumee reservation, which he had formerly owned, and relinquished. He says, "These lands were bought in the names of different persons, and were afterwards transferred to him, as agent, for the purpose of managing and conveying them, in case of sales." He says, "He petitioned congress on the subject early in 1822, but believes no decision has yet been made; that the case was still before congress, and he hopes for a favorable result." It is intimated, he remarks, "that the trustees of the seminary lands of the Michigan Territory have had sufficient influence to delay the sale, with a view to locate those two tracts; and he protests against such an arrangement, as they have no claim to the lands whatever, but that his is a strong claim, and that he was determined to pursue it in every possible way, until he obtained justice." Prentice, a witness, swears that he, having purchased a lot in Port Lawrence, went to Cincinnati, in 1823, to claim an adjustment of his demand; and, whilst there, Baum told him that tracts, one and two, had been surrendered to the United States, but that he expected he, and his associates, would purchase back said tracts, and go on with the building of the town; and that, in such an event, the witness should have the lot, surrendered by him, at the original price and interest. For this lot, Baum sold to Prentice 30 acres, in tract 86, which Prentice agreed, in writing, to relinquish for his original lot, should the above purchase of lots, one and two, be made. A similar contract was made with Bromley. On the 13th January, 1830, an act of congress was passed, which authorized the trustees of the University of Michigan "to exchange, with Martin Baum and others, the tracts of land designated as river lots, numbered one and two, in the United States reserve, &c., heretofore purchased from the U. States, and which have been relinquished by the said Martin Baum," &c.—which tracts, under the act of the 20th May, 1826, had been

selected by the secretary of the treasury for said university—"for such other lands as may be agreed upon by them." As before remarked, Baum, as the agent of the Port Lawrence Company, on the 10th September, 1822, gave to Oliver a certificate, that there was due to him from the Piatt Company, two hundred and thirteen dollars and ten cents. Of this transaction, the defendant Oliver, in his answer, says: "He was occasionally authorized by Baum, soon after the relinquishment, to take up claims of purchasers of lots in Port Lawrence; which he did, and the amount was refunded to him by said Baum. In this way, in 1822, he paid to purchasers, for their claims, $426 14, expecting Baum to refund the same, on his return home. But, on presenting his account, Baum declined paying it, alledging that the Piatt Company had refused to contribute any further, and that he must get their share out of that company."

On the part of the complainant, it is insisted that, at the time this certificate was given, no part of the amount was owing by the Piatt Company. To this inquiry the defendants object, that they are not responsible for Baum's errors, and that their title was derived under a judgment at law. So far as it may be necessary to consider the judgment merely, and the proceedings under it, collaterally, we can neither go into the grounds of the action, nor the technicality of the procedure. If the court had jurisdiction of the subject matter, by a levy of the attachment, we can not avoid the effect of the judgment, by errors either before, or after, its rendition. But there are other aspects of the case, arising from the relations and acts of the parties, in which this inquiry may be important. Prior to the date of the certificate, Oliver states, in his answer, that, having made similar disbursements for the Port Lawrence Company, they were refunded by Baum. The account against the Port Lawrence Company, made out by Baum, as agent, it is presumed, contains an account of all his disbursements. This would seem to be the case from an inspection of the account. The first item, of $59 50, is for so much paid to Williams, for services, as agent, under the relief law. The next is for $221 07, paid Oliver, the 21st October, 1821, for so much refunded by him to Port Lawrence purchasers of lots. And the next charge is, for $426 04, paid to Oliver, on the same account, on the 10th September, 1822. This must be the sum to which Oliver alludes, in his answer, as having been paid by him, and for the one half of which the above certificate was given by Baum.

From the account of Baum, including the above sum, it appears he had paid, as agent of the Port Lawrence Company, the 10th September, 1822, the date of the certificate, $706 61; one half of which sum, being $353 30½, was justly chargeable to the Piatt Company. In the account, Piatt is credited

with $25, paid to Williams, in 1821; and there remains the sum of $474 59, which belonged, as has been shown, to the Piatt Company, but which was applied, at the relinquishment of tracts one and two, to the payment of lands which had been entered by the Baum Company. It is stated there was an arrangement with John H. Piatt, that the Piatt Company should receive, in payment for this sum, Miami Exporting Company paper, which was at a discount of more than fifty per cent. Of this agreement, there is no evidence, except a memorandum in the account of Baum; and, by whom made, or on whose authority, does not appear. If it may be supposed to have been made by Baum, yet it may not have been made on his own knowledge of the fact. It is very singular that this sum, having been received by the United States, as equal to specie, from the Baum Company, in payment for land, should be agreed to be received by the Piatt Company, when it might be convenient for the Baum Company to pay it, in bank paper worth not more than forty cents to the dollar. That the Piatt Company agreed to receive the payment of this sum, in this manner, is so unreasonable as not to require our belief without evidence. The memorandum appears to have been loosely made, about two years after the relinquishment, and is without any authentication. It is not a matter which is properly an item in an account, and can, therefore, derive but little, if any, force from the manner in which it is brought into the account.

In the account there is a credit entered for half the amount of this sum, to the Piatt Company; but we think, under the circumstances, the credit should have been for the full amount. But whether the credit should have been for the whole, or one half of the amount, the certificate, given by Baum to Oliver, was incorrect. If the Piatt Company were entitled to a credit for the full sum, on the 10th September, 1822. the Baum Company were in debt to them about $140; if for but half the sum, they were in arrear to the Baum Company only $91.

About six weeks after Oliver obtained the certificate, he wrote a letter to the complainant, informing him that he had the account against the Piatt Company, and, as he did not know the particular interest of the members of that company, he asked the favor of the complainant to state to him the proprietors, and their respective interests; and he also asked him to say when it would be convenient to arrange his proportion. What answer, if any, was returned. does not appear; nor does it appear that the complainant paid any part of this claim. Whether, having a knowledge that the Piatt Company could not be in arrear for the payments made to the purchasers of lots, or from mere negligence, the complainant failed to pay the whole, or any part of this claim, we are left to conjecture. An attachment was issued

by Oliver on this demand, as before stated, the 5th October, 1825, in the county of Monroe, and territory of Michigan. As an excuse for this proceeding, he alledges, in his answer, that Worth and Worthington, of the Piatt Company, had left Cincinnati; that John H. Piatt, had deceased, and his estate was insolvent. John H. Piatt departed this life in February, 1822, and his estate, which was very large, it is admitted, was found to be insolvent. But it does not follow that his representatives would not have paid a small sum, to save the estate from a sacrifice of property, if it had been demanded of them. However this may be, it is not denied, and seems to be admitted, that the complainant, who lives near the Ohio river, in Kentucky, about forty miles below Cincinnati, is a man of large property; and, it appears, that he was often at Cincinnati, and might have been made amenable to process issued at that place. Under these circumstances it is unaccountable, if the defendant Oliver had no other object than to collect the small demand of $213, that he should have resorted to an attachment in Michigan, more than two hundred miles distant from Cincinnati, the place of his residence. In addition to this consideration, the Baum Company, as partners of the Port Lawrence Company, were liable, equally with the Piatt Company, for the payment of this sum; and, in fact, a suit could not have been sustained against a part of the Port Lawrence Company, under a proper defence, for a debt due by that company. 1 Story, Eq. Jur. 629; Bosanquet v. Wray, 6 Taunt. 597; 2 Bos. & P. 120. But, if this were known to the defendant, he had little ground to apprehend any difficulty, in prosecuting the suit, in a foreign and so remote a tribunal. Of the pendency of the attachment, no one of the Piatt Company seems to have had notice, until long after the judgment was entered.

The object of the bill, in this case, is to open up the accounts of the parties, and to set aside, or disregard, the proceedings by attachment; and, also, the decree of foreclosure, and sale of the mortgaged premises, for the reasons alledged. And we are now to consider the attachment suit. Several objections are taken, which might well be urged, on a writ of error, before a court which could supervise the judgment of the Monroe court; and, it is contended. that they may be here considered and decided. We think otherwise. So far as the question of jurisdiction or fraud is made, or the effect which the relations of the parties may have, the case is fully and fairly before us; but, beyond this, we can not go. The county court of Monroe appear to have a right to issue a writ of attachment, and, from the record, it seems the writ was levied. We can not, now, examine any matter which might have been pleaded in abatement; but an important question has been raised,

which goes to the foundation of the action, and this we may examine. We do not refer to the fact of the indebtment of the Piatt Company, which has already been investigated, but to the question, whether the interest of the company, in these quarter sections, was liable to be attached? Under the writ, the rights and credits of the defendants may be attached; but are not these rights and credits demands on which a suit at law may be brought? In some respects, an attachment differs from an execution. A chose in action, or an existing debt, however evidenced, can not be reached by an execution, but may be levied on by an attachment.

It is clear that the estate, in the hands of the trustee, is not subject to any of his incumbrances. He holds it for the benefit of the cestui que trusts, and it is not subject to his specialty, judgment, or the dower of his widow. 1 P. Wms. 278; 2 P. Wms. 318. The members of the Piatt Company hold a resulting trust in the premises, which is not evidenced, it is believed, by any deed or agreement in writing. This interest, clearly, could not be reached by an execution; but may it be attached? Under the statute of frauds in England, a trust estate may be sold on execution; but such sale is by virtue of the statute. That it may be made liable to creditors, by a proceeding in chancery, is not contested; and it would seem that this is the most appropriate, if not the only, mode by which such an interest can be made liable to creditors. On an attachment, how is the nature of the trust to be ascertained, and the extent of the interest of the cestui que trusts? These things, as in the present case, may not be evidenced by writing; and a court, on an attachment, have no means of ascertaining them. It would seem, indeed, that all the objections to a transfer of such an interest on execution, equally apply to a transfer on an attachment. The vagueness and confusion, and probable sacrifice of property would be as great in the one case as in the other.

The language of Lord Ellenborough, 8 East, 481, though made in reference to a sale of an equitable interest on execution, may well be applied to this case. "The sheriff could only sell, subject to the trusts; that the execution creditor, or the vendee, would still be obliged to go into equity to get an account, or to redeem prior incumbrances, which might have been done, in the first instance, by a judgment creditor, with less expense and delay, besides the destruction of the debtor's estate, which, under so much doubt and difficulty, would sell greatly under value; so that a large equitable interest might be exhausted in satisfaction of a small demand, to the detriment of other creditors."

At common law it is a well settled principle, that an equity is not liable to an execution. In some of the states it has been held that an equity of redemption may be

so sold, and, in others, such an equity is made subject to execution by statute. But wherever the common law rule prevails, an equitable interest can not be sold on execution. 1 Ves. Jr. 431; 5 Bos. & P. 461; 6 Rand. [Va.] 255; 4 Kent, Comm. 153, 154; Vanness v. Hyatt, 13 Pet. [38 U. S.] 294; 2 Saund. 11. In the case of Clark v. Wilson [Case No. 2,841], it was held that a foreign attachment will not lie to recover damages, for the breach of a contract, where the damages are uncertain, and without any rule, furnished by the contract itself, for their measurement. In the case of Pratt v. Law, 9 Cranch [13 U. S.] 456, it was held that, in the state of Maryland, an equity of redemption is liable to an attachment. But the court, in that case, say: "We are not now at liberty to enter into the consideration of the question, whether an equitable interest, in lands and tenements, is subject to attachment under the laws of Maryland, as the court of appeals of that state had decided the point. That decision was made under the provisions of the attachment law of that state."

In looking into the report of that case it will be found that, although the effect of the judgment of the court of appeals of Maryland was correctly stated by the supreme court, yet the court of appeals, in fact, decided the case on a different point. Subsequently to that case, an act of Maryland subjected the equity of redemption to legal process. In 2 N. H. 13, and 10 Johns. 481, it is decided that an equity of redemption can not be attached. In the case of Badlam v. Tucker, 1 Pick. 399, it was said that it was only by statute that equities, or rights to redeem, are subject to attachment by ordinary process. A creditor can reach such an interest of his debtor only by resorting to a court of equity.

But the interest of the Piatt Company was not an equity of redemption, in which the mortgagor, for many purposes, may be considered as holding the legal estate. The legal estate being in the government, the trustee, could, at most, have held only an equity, subject to the equity of his cestui que trusts. And how is such an interest to be reached by an action at law? There is believed to have been no statute or rule of decision in the territory at the time, which made such an interest liable, at law, to the claims of creditors. And, by the rules of the common law, we think it could not be levied on by an execution or an attachment. We can perceive no reason why this interest should not be liable to both these processes, if liable to either. If the interest of the Piatt Company in these quarter sections could not be reached by a proceeding at law, the defendant acquired no right, by his purchase, under the attachment.

It is insisted, if this were the case, that "equity is not the place to vacate judicial proceedings for technical formalities." But

is this a technical formality? It has no reference to the technical mode of proceeding in the attachment, but goes to the foundation of the suit. If the interest in these lands was not liable to an attachment at law, is the question merely a formal one? And why may not the question be raised as well in a court of chancery as in a court of law? It was the proper service of the attachment only which could give the court jurisdiction. And if the writ were attempted to be served by attaching an interest which was not attachable, the court could legally take no jurisdiction, and their proceedings were void. This does not vacate the proceedings. They stand as they at first stood. But they were coram non judice, and not binding upon any one.

In the case of Vanness v. Hyatt, above cited, which was a proceeding in chancery, the court held that the sale of an equity of redemption, on execution, was void, such an interest not being liable to execution. "Courts of equity will, in effect, examine the judgments of foreign courts, and even the sales made under those judgments, where fraud has intervened, or under the judgments a grossly inequitable advantage has been taken. In such cases, they do not disregard such judgments, or directly annul them; but they determine the equities of the case in the same manner as if the proceedings had been matters in pais, subject to their general jurisdiction." 2 Story, Eq. Jur. 531; Lord Cranstown v. Johnston, 3 Ves. 170; Jackson v. Petrie, 10 Ves. 165; White v. Hall, 12 Ves. 321. But if the purchase, under the attachment, be invalid, may not the defendant assert his right to these lands under the assignment from Baum? There can be no doubt that, under this assignment, he was enabled to obtain the patents in his own name. If the record of the attachment suit, and the deed of the creditors only had been presented to the land office, the proceedings would not have been considered, it is presumed, as authorizing patents for the different tracts to be issued in the name of the defendant. The assignment of the certificates by Baum, and this only, enabled the defendant to perfect, in form, his title. It is contended that Baum held these lands in trust, to make good payments that might become due from the Piatt to the Port Lawrence Company. And, it is strongly urged that, at least, the Port Lawrence Company had a lien on these lands for the sum of $1,248, paid on them by a transfer of that sum, at the time tracts one and two were relinquished. That these quarter sections were purchased by the Piatt Company on their own account, at the public sale, is admitted. And the complainant alledges that they were assigned to Baum in September, 1821, in order that payments on them to the United States might be completed under the relief law, and for no other purpose. And these payments were made, it would seem, in pursuance of this intention.

This allegation of the bill is not positively

denied by the answers, but the defendants say they have no recollection of it, and that they understood the lands were held by Baum as a pledge for payments by the Piatt Company, and that Baum had power to sell them. Now, at the time these tracts were assigned, it is not probable they could have been given as a pledge or security, as at that time there were no demands against the Port Lawrence Company, except from the United States, which were paid by the relinquishment. And, if such an agreement were made subsequently, where is the evidence of it? This matter, set up in the answer, is not responsive to the bill, and requires proof, and there are no facts or circumstances of the case which conduce to show that there was any such agreement or understanding between the parties. On the contrary, the facts and circumstances go strongly in support of this allegation in the bill, and the answers do not positively deny it. We feel ourselves authorized, therefore, to assume the fact, as proved, that the object of the assignment to Baum of these quarter sections, by the Piatt Company, is truly stated in the bill. But was there a lien on these lands by the Port Lawrence Company, on account of the $1,248 paid on them? It will at once be admitted that the lien, if any, on these lands was of the same nature as a lien on the lands of the Baum Company, paid for at the same time, and with a part of the same fund. And if Baum could, under this lien, sell the Piatt Company lands to pay the debts of the Port Lawrence Company, he could sell the Baum Company lands for the same purpose. After paying in full for the lands still held by the Port Lawrence Company, the surplus fund belonged equally to the Baum and Piatt Companies; and, it being paid to them in that proportion, no ground is perceived on which to raise a lien on the fund, or on the lands purchased by it, which would not apply generally to the property owned by the respective companies. The fund being paid, was mixed up with the other property of the companies, and how could it afterwards be separated? The argument is, that the fund, having been applied, draws after it, and subjects to the same lien, the whole property with which it is connected.

There are cases where an agent mixes up the funds of his principal with his own, that this consequence may follow; but these cases, in fact and in principle, are wholly dissimilar from the one now under consideration. But it is unnecessary to argue this point. If the lien existed, it did not authorize the assignment of the certificates by Baum. A lien is a charge upon the thing, and not a property in it. 2 Story, Eq. Jur. 461; 2 P. Wms. 20; Ex parte Knott, 11 Ves. 617. Baum received the assignment of the certificates for a specific purpose, and, that purpose being accomplished, he was a mere recipient of the title, having no power over the land. Nor is it necessary, on this point, to discuss the ques-

tion, whether the relation which Oliver bore to the Port Lawrence Company, as agent, forbid his purchase of these lands. He took the assignment of the certificates with a full knowledge of the nature of the trust vested in Baum.

If he did not know these were the lands of the Piatt Company, why did he proceed against them by attachment as such? And why, it may be emphatically asked; did he prosecute a demand against that company, for which the Port Lawrence Company were liable? Oliver had been a member of the Port Lawrence Company, and as an agent, for a time at least, managed their principal concerns. In his own words, "he was better acquainted with the concerns of that company than the trustee." No man understood better than he the interests of the Baum and Piatt Companies, separately and conjointly. Having this knowledge, the assignment of these certificates to him, by Baum, could convey no greater interest than was vested in the assignor. Oliver, as assignee, must, therefore, be treated as holding the lands in trust for the use of the cestui que trusts, subject to any equitable or legal liens which may exist. 2 P. Wms. 706; 1 and 2 Cruise, Dig. tit. 12, c. 4, p. 4*9.

We come now to examine that branch of the case that rests on the mortgage and the proceedings under it. The mortgage was given by Baum, as before stated, on tracts three, four, eighty six, and eighty seven, to secure to Oliver the payment of an account against the Port Lawrence Company, amounting to the sum of $1,835 47. With the view to sustain the charges in the bill, the counsel of the complainant have entered into a detailed statement and argument to show that this account was incorrectly stated, and that a part of it only was due the 9th June, 1823, when it was exhibited. The entire account amounted to the sum of $2,727 41½, of which sum $1,536 48½ appeared to be due to Oliver and Baum for the purchase money paid on town lots 223 and 224, and moneys expended in making improvements thereon, including interest. Without any impeachment, it may be remarked, as a singular circumstance, that the trustee and agent, being equally interested in this part of the account, should have acted upon it, and that the trustee should have executed a mortgage on the entire property of the Port Lawrence Company for the payment of it, and the additional sum of $1,180 93 for so much money paid to Stickney and Henderson. On the account of Oliver there was a credit of $773 24, cash paid by Baum, and two other small items by Prentice and Hunt, which being deducted from the gross amount of the account, left the balance for which the mortgage was given. That Baum, as trustee, had a right to sell and convey lots in the town of Lawrenceport, is clear; indeed, that seemed to be the principal object in vesting him with the title. It is not equally clear that this right to sell and con-

vey extended to the other tracts. But taking this as granted, what interest did the mortgage cover? The fee being in the government, the equity only was covered by the mortgage; it was, then, in this sense, an equitable mortgage. About the one half of the sum for which it was given was payable to Oliver as the partner of the trustee. Independent, then, of this partnership transaction, there was raised by this mortgage about the sum of one thousand dollars, for the benefit of the Port Lawrence Company, which could have afforded that company but little relief. But small as was the sum, it will be found in the sequel to have been more than enough to purchase, at the sale under the mortgage, the whole of the property of the company.

Proceedings were instituted on the mortgage the 13th October, 1825, in the supreme court of the Michigan territory. Baum only was made defendant. A decree for the sale of the premises was obtained, and they were sold to the defendant for the sum of $618 56 the 1st of September, 1828. Was this sale binding on the members of the Port Lawrence Company, who were not made parties to the suit? That every member of the company was directly interested in the suit, is evident. But it is contended that "the title by the certificates being in Baum, and the interest of all the others being involved in his title, they were not necessary parties to the proceedings." And, in support of this proposition, Hopkirk v. Page [Case No. 6,697], and 8 Ohio, 500, are cited. The case Hopkirk v. Page [supra] is not similar to the one under consideration. All persons having distinct interests, says the late chief justice, "must undoubtedly be brought into court; but where the interest of one person is involved in that of another, and that other possesses the legal right, so that the interest may be asserted in his name, it is not always necessary to bring both before the court. Thus, he says, a trustee may sue without naming the cestui que trust as a party." &c. That suit may be maintained in some cases in the name of the trustee, without naming the cestui que trust, is admitted; but this can not be done where the object of the suit is to divest the vested right of the cestui que trust.

The court held, in 8 Ohio, above cited, that a deed which conveyed certain lands in trust could be set aside at the suit of the grantor, on the ground of fraud, without making those who might claim in remainder or reversion, parties. The right barred in that case had not vested at the time of the decree. In the case of Caldwell v. Taggart, 4 Pet. [29 U. S.] 202, the court say all persons are to be made parties who are legally or beneficially interested in the subject matter and result of the suit, extending in most cases to heirs at law, trustees, and executors. Thus, where a remainderman in tail brought a bill against the tenant for life, to have the title-deeds brought into court, and there were annuitants on the reversion, and a child interested for a term

of years prior to the limitation to the plaintiff, that is, incumbrances prior and posterior to the plaintiff's, Lord Hardwicke (3 Atk. 570) refused a decree without first making them parties. So, where a husband, tenant for life, remainder to his wife for life, remainder over, brought his bill, without joining the wife, the objection was made and sustained, on the ground that if there was a decree against the husband it would not bind the wife. 1 Atk. 289.

To a bill of foreclosure of a mortgage, all incumbrances, or persons having an interest at the commencement of the suit, subsequent as well as prior to the plaintiff's mortgage, must be made parties, otherwise they will not be bound by the decree. Haines v. Beach, 3 Johns. Ch. 459; Draper v. Earl of Clarendon, 2 Vern. 517; Godfrey v. Chadwell, Id. 601; Hobart v. Abbot, 2 P. Wms. 643; Fell v. Brown, 2 Brown, Ch. 276; Palk v. Lord Clinton, 12 Ves. 48, 59; Mondey v. Mondey, 1 Ves. & B. 223. A bill of foreclosure against parties to whom an equity of redemption had been assigned upon trust for sale, and to divide the surplus among certain persons named, was held defective for want of the cestui que trusts, as parties interested in the equity of redemption not being made parties, although it was provided by the deed, that the receipts of the trustees should be a discharge. Calverley v. Phelp, 6 Madd. 229.

In Story, Eq. Pl. 187, it is laid down as a general rule, in cases of trusts, that in suits respecting the trust property, brought either by or against the trustees, the cestui que trusts, as well as the trustees, are necessary parties. And where the suit is by or against the cestui que trust the trustees are, also, necessary parties. The trustees have the legal, the cestui que trusts the equitable, right; they are both, therefore, necessary parties to protect their interests. Coop. Eq. Pl. 34; Mitf. Eq. Pl. (by Jeremy) 176, 179. Adams v. St. Leger, 1 Ball & B. 181, 184, 185; 1 Sim. & S. 105; Wood v. Williams, 4 Madd. 186; Burt v. Dennet, 2 Brown, Ch. 225; Osbourn v. Fallows, 1 Russ. & M. 741; Malin v. Malin, 2 Johns. Ch. 238. If a trustee bring a bill for a specific performance of articles, the cestui que trusts should be made parties. Douglas v. Horsfall, 2 Sim. & S. 184; 2 Johns. Ch. 238; Story, Eq. Pl. 188, 189. So if a bill for the redemption, or a bill for the foreclosure, of a mortgage, should be brought against a trustee, the cestui que trusts are in each case necessary parties. Story, Eq. Pl. 190; Calverley v. Phelp, 6 Madd. 229; Whistler v. Webb, Bunb. 53. There are some qualifications to this rule, as where there is a fixed trust fund, and each cestui que trust has a certain aliquot part in it, distinct from the others, so that there is no common interest in the object of the bill; the others need not be made parties. Smith v. Snow, 3 Madd. 10; Montgomerie v. Marquis of Bath, 3 Ves. 560; Lowe v. Morgan, 1 Brown, Ch. 368. If the demand upon the trust property existed before the creation of the trust, a suit may be sustained against the trustee, without making the cestui que trusts parties. Story, Eq. Pl. 191. And where there is a general trust for creditors or others, whose demands are not specified in the creation of the trust, as their number or the difficulty of ascertaining who may answer, &c., it is not necessary to make all the creditors parties. The bill should state, in such case, that it is filed in behalf of all interested. Id. 192. And it is upon this ground of the numerous parties, as well as upon the ground of a virtual representation, and of the general nature of the trust, that trustees of real estate for the payment of debts may ordinarily sustain a suit, either as plaintiffs or defendants, without bringing before the court the creditors or legatees for whom they are trustees, which, in many cases, would be almost impossible. Id. All these modifications of the rule rest upon the ground that it would be extremely inconvenient, if not impracticable, from the number of persons interested, to make them parties. But no such excuse exists in the present case. The cestui que trusts were not numerous, and they were known to Oliver, and should have been made parties to the bill to foreclose the mortgage. They were, in fact, the only persons beneficially interested in the mortgaged property, and not being made parties to the suit they are not bound by the decree. But if the purchase of the mortgaged premises under the decree gives no right, as against the cestui que trusts, who were not parties to the suit, it is contended that the assignment of the certificates by Baum, he having power to sell, must vest Oliver with the equitable title.

The facts which led to this assignment are before the court. There was no sale of the premises by the trustee to the defendant. The transfer was made with the view to give effect to the purchase under the decree. If the decree were not binding on the cestui que trusts, the assignment which was founded on it must be equally invalid. The question is not before us, and, from the facts established, can not be made, whether the trustee had not power to convey to Oliver, by sale. the interests of the cestui que trusts. But after the execution of the mortgage, had the trustee power to sell? In Sugd. Vend. 278, it is laid down, that a power to sell and raise a sum of money implies a power to mortgage, which is a conditional sale. Mills v. Banks, 3 P. Wms. 9. And a power generally to raise a sum out of an estate, enables a sale of it. Wareham v. Brown, 2 Vern. 153.

It may be well to inquire whether the trustee in this case, in making the mortgage, exhausted his power. Palk v. Lord Clinton, 12 Ves. 48; Omerod v. Hardman, 5 Ves. 722. A power to a tenant for life to grant leases was destroyed by a mortgage made by him, and a tenant for life in remainder under the same settlement. 5 Vin. Abr. 432, pl. 10; Sugd. Vend. 56. A conveyance of the whole life

estate, although by way of mortgage, is deemed an extinguishment of a power appendant or appurtenant. Sugd. Vend. 57. The assignment of the certificates in this case by Baum, as in the attachment case, enabled Oliver to obtain the patents in his own name. But this can not affect the relation he bears to the cestui que trusts; he must be considered as holding the lands as mortgagee, and not as a purchaser. The bill charges that tracts one and two were relinquished with the intention of repurchasing them. But, as before remarked, of this intention, at the time, there is no evidence, and it is denied in the answers. It appears, however, within four months after the relinquishment, Baum petitioned congress on the subject, and placed his claim for relief exclusively on the fact, that, under the former purchase, he had sold town lots, and that improvements on the lots had been made by purchasers, which would subject him to damages; and he prayed that these tracts might again be offered for sale, or that relief in some other form might be given. And in his letter to Senator Brown the ensuing year, 1823, which inclosed a copy of this petition, he stated that others were interested with him in the matter of his petition, although the petition was signed only by himself. And, again, in 1827, in his letter to the commissioner of the general land office, complaining that the above tracts had been withdrawn at the land sales at Delaware, in 1827, at which place he had attended with the intention of purchasing them, he states the claim of himself and his associates to these lands, and remonstrates against their being located for the Michigan University, as they could have no claim to them. And so far from abandoning his right, he says, it is still before congress, that he hopes for a favorable result, and expresses a determination to pursue it until he obtains justice. At this time the suits of Oliver were pending in Michigan by attachment and to foreclose the mortgage, and, indeed, a judgment had been entered on the attachment, and the sales, under both suits, took place the ensuing year. In the summer of 1828, before these sales, the tracts one and two having been selected for the university, Oliver proposed, as the agent of Baum, to its trustees to exchange a certain part of the lands, then held in the name of Baum, for tracts one and two. And eventually this exchange was effected in January, 1831. Previous to this, on the 13th January, 1830, the law was passed which has been referred to, authorizing the university to make the exchange with Martin Baum and others. In 1831 deeds were executed, and Oliver became the patentee of tracts one and two; and shortly afterwards Baum and Williams became interested with him in laying out a town on the site of Port Lawrence; and they proposed to make titles to the former purchasers of town lots, on their complying with the conditions of sale.

Now, when we consider the agency of Baum and of Oliver, and scrutinize the acts of both, as above stated, without explanation, it would be difficult to resist the conclusion, that, in obtaining tracts one and two, they acted in behalf of the Port Lawrence Company. After the relinquishment of tracts one and two, there can be no doubt that either Baum or Oliver had a right to purchase them. But it would seem the petitions of Baum to congress in behalf, as he declared, of himself and his associates, his letter to Senator Brown in 1823, and especially his letter to the commissioner of the general land office in 1827, the passage of the law in 1830, authorizing Baum and others to exchange lands for these tracts, connected with the application to the trustees of the university by Oliver, as the agent of Baum, to exchange lands owned by Baum and others for them, form a combination of circumstances conducing strongly to show that tracts one and two were obtained for the Port Lawrence Company.

But it is insisted by the defendant's counsel that these circumstances are so explained as to show that, neither the application of Oliver to the trustees of the university, nor the law authorizing the exchange, had any reference to the interests or proceedings of Baum, as agent of the Port Lawrence Company. That his name was used in the proposition to the trustees to exchange by Oliver, who represented himself as the agent of Baum, is admitted. At least the answer of Oliver admits that such is the entry in the proceedings of the trustees; but he alledges that the proposition was made on his own account, and that the name of Baum was used, like the names of others, without his knowledge, and for the purpose of assuring the trustees, should they sanction the exchange, that a town would be built up on tracts one and two. This explanation involves the defendant in an act equivocal in its character, and which can scarcely be justified. If the names thus used formed an inducement to the contract by the trustees, as the defendant admits he supposed they would, and he was wholly unauthorized to use them as he now says, unless this fact was stated in his proposition, the trustees, on this ground, might have claimed a recision of the contract.

From the answer of the defendant, Williams, if that could be received as evidence in favor of his codefendant, it appears that his name was used in the negotiation with the trustees without his knowledge. And in the deposition of Mr. Wing, it is stated that the witness understood (of course from Oliver) that the name of Baum was used because, at the time the proposition was made, the title was in him, and that "Baum was ultimately to become interested." But whether Baum and Oliver co-operated or not, as agents of the Port Lawrence Company, in obtaining the title to tracts one and two, may make no difference in the final decision of this case. In conformity with the view taken, Oliver could set up no title to the lands

under the judicial proceedings stated, but must rely upon his assignment from Baum. And, under the assignment, having notice of the trust, he could take no greater interest than Baum possessed. That, in relation to the cestui que trusts, though he obtained from the government the legal title, yet he holds it only in trust. This position being sustained, so far as Oliver is concerned, it only remains to examine what effect was produced on the interests of the cestui que trusts, by a conveyance to the university of tracts three and four, and three of the quarter sections, in exchange for tracts one and two.

It is a well established rule, in equity, that no act of a trustee shall prejudice the cestui que trust. Cruise, Dig. tit. 12, c. 4, p. 488; 2 P. Wms. 706; 1 Story, Eq. Jur. 317; Newl. Cont. 461; Ex parte Lacey, 6 Ves. 625, 626; 1 Madd. Ch. 92, 93; Chesterfield v. Janssen, 2 Ves. Sr. 138; Ex parte James, 8 Ves. 337, 345; Ex parte Bennett, 10 Ves. 381, 385; Cane v. Lord Allen, 2 Dow, 289, 299; Van Horne v. Fonda, 5 Johns. Ch. 388; Brown v. Rickets, 4 Johns. Ch. 303; 1 Johns. Ch. 510, 535, 623, 629. Where the trustee purchases the estate of his cestui que trust, the question is not whether he has made a profit, but the sale is set aside as a matter of course, unless ratified with a full knowledge of the circumstances by the cestui que trust. 1 Story, Eq. Jur. 318; Davoue v. Fanning, 2 Johns. Ch. 252; Campbell v. Walker, 5 Ves. 678, 680, 13 Ves. 601; Morse v. Royal, 12 Ves. 355. If a trustee purchase land with the trust fund, and take the conveyance in his own name, in equity, the land is held as a resulting trust for the person beneficially interested. 2 Story, Eq. Jur. 456; 2 Fonbl. Eq. bk. 2, c. 5, § 1, note 6; Deg v. Deg, 2 P. Wms. 414; Sugd. Vend. c. 15, § 3, p. 628; Perry v. Phelips, 4 Ves. 107; 17 Ves. 173; Bennet v. Mayhew, cited in 1 Brown, Ch. 232. The rule is, whatever acts are done by the trustee, are presumed to be done for the benefit of the cestui que trust, and not for the benefit of the trustee. 4 Kent, Comm. § 61; Davoue v. Fanning, 2 Johns. Ch. 252; Holridge v. Gillespie, Id. 30; Griffin v. Griffin, 1 Schoales & L. 352; James v. Dean, 11 Ves. 392; Nesbitt v. Tredennick, 1 Ball & B. 46, 47; Wilson v. Troup, 2 Cow. 195. Wherever the trust fund has been wrongfully converted into another species of property, if its identity can be traced, it will be held in its new form liable to the rights of the cestui que trust. 2 Story, Eq. Jur. 503; Ex parte Dumas, 1 Atk. 232, 233; Scott v. Surman, Willes. 400; Thompson v. Perkins [Case No. 13,972]; Burdett v. Willett, 2 Vern. 638; Murray v. Lylburn, 2 Johns. Ch. 441; Lewis v. Madocks, 17 Ves. 57, 58; Holridge v. Gillespie, 2 Johns. Ch. 30; Evertson v. Tappen, 5 Johns. Ch. 497; Hart v. Ten Eyck, 2 Johns. Ch. 62, 104. The cestui que trust has his option, in cases of this sort, to insist upon taking the property; or he may disclaim any title thereto, and pursue any other rem-

edy in rem or in personam. But he can not insist on opposite and repugnant rights. Docker v. Somes, 2 Mylne & K. 655; Murray v. Lylburn, 2 Johns. Ch. 441, 442, 444, 445; Murray v. Ballou, 1 Johns. Ch. 581; 2 Story, Eq. Jur. 506. This doctrine is not limited to trustees, but extends to all other persons in a fiduciary relation to the party, whatever that relation may be. Wormly v. Wormly, 8 Wheat. [21 U. S.] 421, 438; Brown v. Lynch, 1 Paige, 147; Fellows v. Fellows, 4 Cow. 682.

From these authorities it would seem to follow that the Port Lawrence Company have a right to call upon Oliver to account, as trustee, for tracts one and two. If he received the assignment from Baum of the tracts which were exchanged with the university for tracts number one and two, with a full knowledge of the trust, he could, under the circumstances, only hold those lands in trust. Standing in this relation, by the exchange of these lands for tracts one and two, the cestui que trusts have a right to claim the property received in exchange for that which, in equity, belonged to them. The principle must be the same whether money or property be given in purchase of land, the trust fund or property may be followed to the land purchased, at the option of the cestui que trust.

In the present case the complainant asks not only the lands received in exchange by Oliver, but, also, those conveyed to the university. That he can not claim both is perfectly clear. Oliver has purchased the lands from the university, which he conveyed to it for tracts one and two. And it is a question whether the court should not limit the plaintiff's claim to the lands thus purchased. As this point can be better determined when we shall have all the facts before us, as to the present condition of the property, it is reserved. The question of notice, as it regards the defendant, Williams, will now be examined. In his answer he denies notice, and alleges that his various purchases, of a part of the property in controversy, were made bona fide, and for a valuable consideration; and that the purchase money was paid before he had any notice of the complainant's claim or title. This defendant had no interest in either the Baum or Piatt Company at the time of the public sale; but subsequently, in the year 1819, he purchased an interest in the Port Lawrence Company. This is admitted in his answer. He was appointed an agent by Baum to attend at the land office, in September, 1821, to relinquish to the United States tracts one and two, and to apply the money paid on those tracts to the payment of others, as it was applied. This necessarily gave him a knowledge of the interests of the Baum and Piatt Companies, separately and conjointly. The apportioning of the funds arising from the relinquished lands, first to the lands of the Port Lawrence Company, and then to the lands of the Baum

and Piatt Companies, respectively, showed the joint and several interests of the companies. It is true the certificates of purchase were all assigned to Baum; but, standing in the relation which the defendant bore to the parties, he could not but have known, when he performed the above service, that the five quarter sections belonged to the Piatt Company, and had been assigned to Baum to enable him to complete the payments on them. He was, in fact, a member of the Port Lawrence Company, having an undivided interest in their property; and, as a matter of course, he could not but know in what lands he had an interest. As a member of the Port Lawrence Company this defendant must be presumed to be acquainted with the transactions of that company. Baum, in fact, was his agent, and the legal proceedings resorted to by Oliver being in operation, no other ground of title could be assumed than the assignment. And this assignment, as has been shown, as it regards the four quarter sections assigned, was not within the scope of his power, and was, consequently, invalid; and as regards tracts three, four, eighty six, and eighty seven, the assignment rested for its validity on the decree of sale, which was not binding on the cestui que trusts, who were not parties to the suit.

These acts of the trustee or agent, being in the one case not valid for want of power, and in the other invalid, as the sale was invalid, were known to Williams. A notice to an agent is notice to his principal. Brooks v. Marbury, 11 Wheat. [24 U. S.] 78. And here is a case where an agent does certain acts which are not within his powers, and which, consequently, do not bind his principals; the defendant being one of them, can he set up a want of notice? Can a cestui que trust, connected with others, purchase a part or the whole of the trust estate through the unauthorized acts of the general agent, and insist that he is a purchaser, without notice of the acts of the agent? Baum, in making the assignment, was as much the agent of Williams as if he were the only cestui que trust; and the assignment, being unauthorized, did not divest his interest. Is not Williams to be presumed to be acquainted with his own title? And, if he is, he had full knowledge of the acts of his agent Baum; and although he may have been mistaken as to the legal effect of Baum's acts, still, knowing the facts, he is responsible for the legal consequences. Wormly v. Wormly, 8 Wheat. [21 U. S.] 421; 1 Story, Eq. Jur. 390. The title is thus in the hands of Oliver by the assignment of Baum, but Oliver having notice, as well as Williams, of the powers of the trustee, the lands in the hands of Oliver are still held in trust; are held, so far as the Port Lawrence interest is concerned, in trust for the defendant, Williams, and his partners. Oliver, beyond the powers of his trust, conveyed a part of these lands to the Michigan University, and received in exchange there-

for tracts one and two. Now, as has been shown, the cestui que trusts may claim the lands received in exchange. The change in the property makes no change in the nature of the trust. The defendant, Williams, then, may claim, as cestui que trust, to the extent of his interest, a part of tracts one and two, as well as a part of tracts eighty six and eighty seven. But he claims the one half of these tracts as a purchaser, without notice, from Oliver; without notice of his own title, for it amounts to that. If it can be supposed that he had notice of his own title, he had notice of the full history of the title of his partners.

If the positions of the court on the great points of this case be correct, there would seem to be no doubt that this defendant is chargeable with notice. And as this point is considered free from difficulty, it is unnecessary to refer to the negotiations of Oliver with the trustees of the university, the recital of their deed to him, of the patent from the government to Oliver, and of those contained in the different deeds from Oliver to the defendant, to show notice.

Two grounds were urged by the defendant's counsel which have not been examined; and as much stress seemed to be laid on them, they will here be very concisely noticed. One was the lapse of time; and the other, that if, upon the whole, substantial justice has been done, the court will not, for any informality, open up the proceedings. In answer to the first it would be enough to say that the statute of limitations does not run against an established trust. Nor does lapse of time operate to bar in such a case, where the title has been held consistently with the trust set up. In such a case no presumption arises against the cestui que trust from lapse of time. Prevost v. Gratz [Case No. 11,406]; Boteler v. Allington, 3 Atk. 459; Cholmondeley v. Lord Clinton, 2 Mer. 360; 4 Desaus. Eq. 474; 1 McCord, 395, 398; 4 Desaus. Eq. 77. If the views of the court be correct, the character of the estate was not changed by an exchange of the lands, and the obtainment of the patents by Oliver. But, at all events, negligence can only be imputed from the time the trust property was purchased by Oliver, and but few years elapsed from the time the notice of this purchase was received until this bill was filed. Upon this view we think that lapse of time does not bar the right of the claimant.

The other ground, as to substantial justice having been done, is equally unsustainable. That the Port Lawrence Company, generally, have been remiss in not paying, in just proportion by the members, the expenses of the company as they accrued, can not be denied. And that the complainant and the other members of the Piatt Company, forming a part of the Port Lawrence Company, were most negligent in this duty, is not doubted. That the trustee of the company, from his position, became involved by claims of pur-

chasers of lots, is established by the evidence. But an examination of this branch of the case will show that his involvement on this account was not so great as he supposed it to be. And it will appear that the account made out by him was not as full as would be required by a court of equity.

Not to refer to other accounts against the company, it appears by the one made out by Oliver for himself and Baum, for the purchase and improvement of lots 223 and 224, that whilst the company were charged for every item of expenditure in building a warehouse and a tavern, and the instalments paid on the purchase, with interest, there was no allowance for rent. The evidence shows that rent was received, but the amount is not stated. Now, it is not always a correct mode of showing the value of an improvement by the cost of making it. And where such improvement has been occupied two or three years by tenants, it is proper, under the above circumstances, that rent should be deducted. How the trustee and Oliver, in this respect, settled with the other purchasers of lots, does not appear. No account is taken of the eight hundred fifty five dollars and thirty three cents received at the sale, and transmitted to the trustee by Schenck. This sum may have been accounted for, as Oliver alledges in his answer, but it was proper that so considerable an item should have been stated, and not left to the memory of the trustee or his agent. Baum and Oliver appeared to have been the largest creditors of the company for improvements; and although, in the account exhibited by Oliver to Baum, there was a credit to the latter for upwards of seven hundred dollars, yet how this money was paid nowhere appears. There is no credit for this sum in the general account of Baum against the company. As before remarked, independently of this partnership account for improvements by the mortgagee, Baum received the payment of little more than one thousand dollars to the creditors of the Port Lawrence Company.

The case made by the defendants is simply this: The lands of the Port Lawrence Company, consisting of tracts three, four, eighty six, and eighty seven, have been sold, and four quarter sections owned by the Piatt Company, to Oliver, for the sum of about eight hundred and sixty dollars; and there is still a large balance, more than one half, of the account of Oliver, unpaid, and this account was, for moneys paid, as agent, to purchasers of lots in Port Lawrence. With a part of the land thus sold, Oliver exchanged with the Michigan University for tracts one and two. For these tracts the Port Lawrence Company agreed to pay, some years before, about twenty thousand dollars; and this sum was less than they would have sold for, the defendants contend, had it not been for the fraudulent combination of the two companies at the public sale. By the

acquisition of these tracts Oliver became the owner of all the improvements made in the town of Port Lawrence, which proved so prolific a source of claims against the company, and which has produced to him so rich a harvest. In addition to lots one and two, he and those associated with him held, under the purchase, numbers eighty six and eighty seven, and one of the five quarter sections, having paid for the whole the sum of $860.

From this short outline, we are mistaken if any very strong grounds of equity arise against the right of the complainant, which should control the decision of the court. If the complainant's equity rested on his own vigilance and punctuality, in attending to the concerns of the Port Lawrence Company, he would have but a slender foundation for a decree. But this is not the ground of his equity. It is founded on the acts of the agents, and not on what the complainant has done, or omitted to do, since the formation of the company. He has been negligent, but this does not subject his property, and the property of his associates, to any mode of transfer, however illegal. A company or an individual can be divested of property only in the mode sanctioned by law; and, for the reasons stated, we think the mode adopted by the defendants, in the present case, was not conformably to legal principles. The course pursued, in all probability, was the result of a misconception of the law applicable to the relation of the parties and the facts of the case; and we are always gratified in being able to take this ground, instead of one which would cast a shade over the character of any of the parties. On this occasion this gratification is peculiar, from the high character sustained by the living and the dead who were the principal agents in the above transactions.

That the court may have the facts fully before them, in regard to the present condition of the property, they order an account to be taken of the sales made in whole or in part of the tracts one, two, three, four, eighty six, eighty seven, and of the four quarter sections, designating the date and amount of sales in each tract, titles made, moneys received and due; and, also, an account of all moneys expended, either in the purchase or improvement of each tract, by the defendants, Williams and Oliver, or either of them, including compensation and expenses for the agency exercised in the general management of the property, &c.

[NOTE. Upon reargument this opinion was confirmed. Case No. 11,116. Exceptions were filed to the master's report. These were heard, and the case recommitted. The case was again several times recommitted because of death of parties or other causes, and a final decree was not entered until July 30, 1842. The decree was in conformity with the opinion above. From this decree the respondents took an appeal to the supreme court. The decree was affirmed, 3 How. (44 U. S.) 333.]